Filed 3/17/25  P. v. Penn CA3

## NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C100776 |
| Plaintiff and Respondent, | (Super. Ct. No. 98F11096) |
| v. | |
| WILLIAM THOMAS PENN, | |
| Defendant and Appellant. | |

In 1999, a jury found defendant William Thomas Penn guilty of first degree murder.  The jury also found true a special circumstance alleging the murder occurred during the commission of a robbery.  The trial court sentenced defendant to a term of life in prison without the possibility of parole.  In 2022, defendant filed a petition for resentencing under Penal Code[1] section 1172.6.  Following an evidentiary hearing, the trial court denied defendant's petition and affirmed defendant's murder conviction.  The court concluded defendant was guilty of first degree murder beyond a reasonable doubt under any one of three still-valid theories of murder.

---

[1] Further statutory references are to the Penal Code unless otherwise indicated.

On appeal, defendant contends there is insufficient evidence to prove beyond a reasonable doubt that he is guilty of first degree murder under a still-valid theory of murder. We will affirm the judgment.

BACKGROUND

In November 1998, defendant (then 32 years old), protected 17-year-old Jason S. from being robbed at a light rail station. As a "thank you," Jason invited defendant to stay the night at his apartment. After staying the night, however, defendant did not leave. Jason did not complain because defendant was giving him drugs.

Several days later, defendant introduced Jason to 20-year-old Damion Horton. Defendant told Jason that Horton also would be staying at Jason's apartment; defendant did not ask Jason's permission. While defendant and Horton were living in Jason's apartment, Jason watched them sell drugs. Jason noted defendant "seemed to be in charge"; defendant was, as Jason described it, "running the show." Horton did what defendant directed him to do. Jason never saw the two men argue.

On December 9, 1998, Jason asked defendant to leave. Defendant became angry, he said Jason owed him money and "it wasn't right . . . to ask him to leave." Defendant then hit Jason "a couple [of] times," leaving a visible injury. Horton, who witnessed the beating, did not stop it. Scared, Jason let them stay.

Two days later, Jason's mother, Elizabeth H., came to the apartment to take Jason to a movie. When she arrived, Elizabeth saw the injuries to her son's head. She asked Jason what happened. He told her he was attacked in the street. Once they were in the car, away from defendant, he told her the truth: defendant had hit him. Later that night, when Elizabeth and Jason returned to the apartment, Elizabeth and defendant argued. The argument lasted about 10 minutes and ended when defendant and Horton left the apartment. When the men left, Elizabeth and Jason installed new locks on the apartment door.

Defendant and Horton returned to Jason's apartment the next morning acting as though nothing had happened. Jason let them inside. Two days later, when defendant and Horton left to

2

buy drugs, Jason called the police to have the two men removed from his apartment. Rather than removing defendant and Horton, the police arrested Jason for being drunk in public.

While Jason was in jail, Horton invited R.C. to the apartment. Defendant and R.C. sat in R.C.'s car outside of the apartment and talked. Defendant told R.C. that Elizabeth owed him money for drugs. He told R.C. that he would "fuck [Elizabeth] up" if she did not pay him.

Shortly after Jason was released from jail, he attempted suicide. He was hospitalized for several days; Elizabeth visited him frequently. During her visit on December 21, Elizabeth told Jason she was going to his apartment to kick defendant and Horton out and change the locks.

On December 22, defendant called Nicole S. around 5:00 a.m. Defendant told her that something was going to happen that day; he said Nicole may see him on the news, she may never see him again, or he may be dead. Later that same day, around 11:00 p.m., defendant called Nicole again and told her something "really did happen today, and I'm going to be on the news." He told Nicole he was in Elizabeth's car, and he was calling from Elizabeth's phone. He also told Nicole that he and Horton had been at Jason's apartment getting their things together and pretending to leave. But rather than leave, they kicked the door in and attacked Elizabeth inside the apartment. Defendant told Nicole: "A towel was supposedly wrapped around her neck and pulled together, I guess, to strangle her? And she fought her way out of that . . . that that's when a knife was used." Then, he claimed, he stood aside and watched Horton stab Elizabeth to death.

About an hour after that phone call, defendant and Horton showed up at the home of Elaine M., in Los Angeles. Horton confessed to Elaine: "[W]e killed somebody." Upset, Elaine began to cry; she asked them why. Defendant responded: "She owed us money." According to Elaine, defendant showed no sadness or remorse.

Defendant and Horton left Elaine's house. They went three doors down to the home of Lisa E. Horton also confessed to Lisa: "[W]e killed somebody." In response to Horton's confession, defendant said: "I told him to stab her some more." During the exchange, Lisa observed that Horton was following defendant's lead, agreeing to whatever defendant said.

Defendant and Horton soon left Los Angeles and continued driving Elizabeth's car south until around 4:00 a.m., when they arrived in Oceanside. In Oceanside, they met O.K.; defendant

3

was driving. O.K. got into the car and defendant drove the three of them to San Diego. During the drive to San Diego, defendant spoke to O.K. outside of Horton's presence. Defendant told O.K. that someone's mother had given them until December 22 to move out of the apartment, but defendant refused to leave. According to defendant, the mother and son owed him $1,700; he said he would have accepted $500.

Once the three men reached San Diego, they stopped at a fast-food restaurant to eat. While they were there, Horton said, "I can't stop seeing her." He pushed his food away and ran to the bathroom. When he returned to the table, Horton had tears in his eyes and, for a few minutes, he stared silently out the window. In a daze, Horton stood up, walked outside, and walked into traffic. O.K. grabbed him and brought Horton back to the sidewalk.

On December 23, 1998, Elizabeth's body was found in Jason's apartment. She died from multiple stab wounds; there were 32 sharp force injuries across her body and defensive wounds on her hands. Elizabeth also had a patterned abrasion around her neck consistent with being strangled using a soft cloth. Defendant and Horton were arrested that day; they still had Elizabeth's car.

A jury later found defendant guilty of first degree murder and robbery.[2] The jury also found true the special circumstance that the murder was committed during the commission of a robbery. (*People v. Horton* (Mar. 6, 2002, C034681) [nonpub. opn.].) On January 7, 2000, the trial court sentenced defendant to life without the possibility of parole. Defendant appealed from the judgment. This court struck the $10,000 parole revocation fine imposed by the trial court, but otherwise affirmed the judgment. (*Ibid.*)

In 2019, defendant filed a petition for resentencing pursuant to former section 1170.95. The trial court summarily denied the petition. On July 13, 2022, defendant filed a second petition for resentencing pursuant to section 1172.6. The trial court appointed counsel, found defendant

---

[2] A separate jury found Horton guilty of first degree murder, robbery, and murder during the commission of a robbery. The jury also found true an arming enhancement. Horton was sentenced to life without the possibility of parole.

established a prima facie case for relief, and on September 28, 2022, issued an order to show cause.

On January 19, 2024, the trial court presided over the order to show cause evidentiary hearing. No new evidence was presented. The parties argued about the admissibility of Horton's testimony and pretrial statements and the court ruled them admissible.

On March 13, 2024, the court issued a written decision finding the People "met their burden of establishing beyond a reasonable doubt that [defendant] remains guilty of murder under a still-valid theory of liability; that is, even if [defendant] was not the actual killer, he aided and abetted codefendant . . . Horton when he killed the victim." The court found that, even without considering Horton's testimony or pretrial statements, the evidence proved beyond a reasonable doubt that defendant was guilty of murder under three different, still-valid legal theories: (1) aiding and abetting express malice murder; (2) aiding and abetting implied malice murder; and (3) felony murder as a major participant in the underlying felony who acted with reckless indifference to human life.

In support of its ruling, the trial court observed that defendant did not dispute he was present during the killing. In addition, during the early morning phone call to Nicole on the day of the killing, defendant was clearly "planning something quite dramatic and newsworthy that might result in his death." In other words, he was planning something more than just an assault or a robbery.

The court was not persuaded by defendant's claim that he stood by and watched while Horton attempted to strangle Elizabeth; then, when Horton failed to kill Elizabeth, defendant stood by and watched Horton stab her 32 times. This was, as confirmed by the evidence, an attack that lasted several minutes; it was "not a brief attack that was over in an instant[,] which might leave someone shocked."

Moreover, and contrary to defendant's claim, defendant was not a " 'scared teenager' " at the time of the murder. Rather, defendant was in his 30's, and, between he and Horton, defendant was the "the dominant partner." These facts alone, the trial court concluded, undermined

5

defendant's claim that he was "passive and subservient during the physical altercation that led to the victim's death."

The trial court also was not persuaded by defendant's argument that Lisa E.'s testimony was fabricated. To the contrary, the court found Lisa credible, and her testimony established that, "at a bare minimum [defendant] encouraged Horton by cajoling him to 'stab [Elizabeth] some more.' "

The court concluded: "[defendant] did not merely plan to rob [Elizabeth], he planned something drastic; at the very least he planned a violent assault if [she] did not comply." And, "[a]ccording to [defendant's] current argument, he stood by as Horton strangled then stabbed [Elizabeth] 32 times and promoted or encouraged the offense by instructing Horton to 'stab her some more.' This demonstrates reckless indifference to human life."

Defendant appeals from that order.

DISCUSSION

A.     *Applicable Legal Principles*

" 'Effective January 1, 2019, Senate Bill No. 1437 (2017-2018 Reg. Sess.) amended the felony-murder rule to provide: "A participant in the perpetration or attempted perpetration of a felony listed in subdivision (a) in which a death occurs is liable for murder only if one of the following is proven: [¶] (1) The person was the actual killer. [¶] (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree. [¶] (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of [s]ection 190.2 [the statute defining felony-murder special circumstances]." (§ 189, subd. (e).) The new law was designed "to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." ' " (*People v. Njoku* (2023) 95 Cal.App.5th 27, 40.)

At an evidentiary hearing on a petition for resentencing under section 1172.6, the trial court is required to decide whether the prosecution has carried its burden to prove beyond a

6

reasonable doubt that the defendant could be convicted of murder under current law. (*Id.*, subd. (d)(3).) In making that determination, the trial court sits as an independent trier of fact. (*People v. Guiffreda* (2023) 87 Cal.App.5th 112, 123; *People v. Schell* (2022) 84 Cal.App.5th 437, 442.) A trial court's resolution of evidentiary conflicts contained in a cold record during a section 1172.6 evidentiary hearing does not offend due process. (*People v. Njoku*, *supra*, 95 Cal.App.5th at pp. 43-47.)

On appeal from the denial of a section 1172.6 petition following an evidentiary hearing, we review the trial court's findings for substantial evidence. (*People v. Vargas* (2022) 84 Cal.App.5th 943, 951.) We accept the trial court's determinations on witness credibility and evidentiary conflicts, along with any logical inferences it may have drawn from the evidence. (*People v. Oliver* (2023) 90 Cal.App.5th 466, 479 [deference to trial court's credibility findings and evidentiary conflicts on a cold record at a § 1172.6 evidentiary hearing remains appropriate]; *People v. Didyavong* (2023) 90 Cal.App.5th 85, 97.) And we "review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the [trier of fact] could reasonably have deduced from the evidence." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357; *Didyavong*, at pp. 97-98.)

We will not reverse the trial court unless there is no hypothesis upon which sufficient substantial evidence exists to support its decision. (*People v. Didyavong*, *supra*, 90 Cal.App.5th at p. 97.)

B.     *Analysis*

The trial court found the evidence proved beyond a reasonable doubt that defendant was guilty of murder under three still-valid theories of first degree murder: (1) aiding and abetting express malice murder; (2) aiding and abetting implied malice murder; and (3) felony murder under section 189, subdivision (e)(3). We can affirm defendant's conviction on any one of these legal theories, we need not find evidence sufficient to convict him under each of them. (*People v. Covarrubias* (2016) 1 Cal.5th 838, 892, fn. 22 ["Because we affirm defendant's conviction for attempted murder and assault with a firearm on the theory that he was the actual perpetrator of

those crimes, we need not consider whether the evidence is sufficient to convict him of those crimes under an alternative theory of liability"].)

Thus, without addressing whether there is sufficient evidence to support all the trial court's legal theories, we conclude sufficient evidence supports at least one: that defendant committed felony murder under section 189, subdivision (e)(3). To find defendant guilty of felony murder under section 189, subdivision (e)(3), the People were required to prove beyond a reasonable doubt that he was a major participant in the underlying felony who acted with reckless indifference to human life.

### 1. Major Participation in Underlying Felony

" '[M]ajor participation' should be understood as the phrase is used in common parlance, as including those whose involvement is ' "notable or conspicuous in effect or scope" ' and who are ' "one of the larger or more important members . . . of a . . . group." ' " (*People v. Banks* (2015) 61 Cal.4th 788, 800.) Factors commonly considered are: "What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal weapons? What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death? What did the defendant do after lethal force was used?" (*Id*. at p. 803, fn. omitted.) Whether a defendant acted as a major participant depends on the totality of the circumstances. (*Id*. at p. 802.) "No one of these considerations is necessary, nor is any one of them necessarily sufficient. All may be weighed in determining the ultimate question, whether the defendant's participation 'in criminal activities known to carry a grave risk of death' [citation] was sufficiently significant to be considered 'major.' " (*Id*. at p. 803.)

Here, the evidence demonstrates defendant participated in planning the attack that ended in Elizabeth's death. When Jason asked defendant to leave the apartment, defendant refused saying Jason and Elizabeth owed him money. Then, days before Elizabeth's death, defendant told R.C. that he intended to get his money from Elizabeth or "fuck her up" if she did not pay him. And, on

the day of the attack, he called Nicole to tell her he may be on the news later that day -- or may be dead.

It is undisputed that defendant was in the room when Elizabeth was killed.  Even if it is true that defendant simply stood by and watched, as he claimed, the attack on Elizabeth lasted for several minutes.  Thus, there was ample opportunity for defendant to have stopped Horton while Horton was trying to strangle Elizabeth.  He did not.  When Horton's effort to strangle Elizabeth with a towel did not kill her, defendant could have left the apartment and taken Horton with him, leaving Elizabeth alive.  He did not.  Further, when Horton picked up a knife and attacked Elizabeth, stabbing her 32 times while she fought back, defendant could have stopped Horton.  Again, he did not.

Defendant was over 10 years older than Horton and, according to several witnesses, the leader of the two.  There is no evidence he was unable to stop Horton.  To the contrary, the evidence indicates that defendant rooted him on, telling Horton to "stab her more" as Horton attacked Elizabeth with a knife.  And when the attack was finally over, rather than call for help, defendant took Elizabeth's cell phone and her car.  Defendant then drove Elizabeth's car all the way to San Diego, stopping to pick up O.K., to visit Elaine and Lisa, and to eat fast food.  Defendant even used Elizabeth's cell phone to call Nicole and tell her he would be on the news.

Based on this record, there is sufficient evidence to support the trial court's finding that defendant acted as a major participant in the underlying robbery of Elizabeth.

### 2. *Reckless Indifference to Human Life*

"Reckless indifference to human life 'requires the defendant be "*subjectively* aware that his or her participation in the felony involved a grave risk of death." ' " (*People v. Banks*, *supra*, 61 Cal.4th at p. 807.)  "We analyze the totality of the circumstances to determine whether [a defendant] acted with reckless indifference to human life.  Relevant factors include:  Did the defendant use or know that a gun would be used during the felony?  How many weapons were ultimately used?  Was the defendant physically present at the crime?  Did he or she have the opportunity to restrain the crime or aid the victim?  What was the duration of the interaction between the perpetrators of the felony and the victims?  What was the defendant's knowledge of

9

his or her confederate's propensity for violence or likelihood of using lethal force?  What efforts did the defendant make to minimize the risks of violence during the felony?  [Citation.]  ' "[N]o one of these considerations is necessary, nor is any one of them necessarily sufficient." ' " (*In re Scoggins* (2020) 9 Cal.5th 667, 677.)

We agree with the trial court's assessment that, based on the evidence, it is not credible that defendant was "passive and subservient during the physical altercation that led to the victim's death."  As we described above, defendant stood by and watched as Horton repeatedly tried to kill Elizabeth.  He bragged to Lisa that while Horton was stabbing Elizabeth, he told Horton to "stab her more."  Defendant planned to inflict violence upon Elizabeth either himself or at his direction, and he made no effort to protect her from Horton's lengthy and violent assault.  After the attack, defendant took Elizabeth's car and her phone and left town, showing no remorse.  Sufficient evidence supports the trial court's finding that defendant acted with reckless indifference to human life.

In sum, there is sufficient evidence to support the trial court's conclusion that defendant was a major participant in the robbery of Elizabeth and acted with reckless indifference to human life pursuant to section 189, subdivision (e)(3).  In light of our conclusion, we need not address the court's findings related to alternative murder theories.  We will affirm the judgment.

DISPOSITION

The judgment is affirmed.

/s/_____<br>WISEMAN, J.*

We concur:

/s/_____
ROBIE, Acting P. J.

/s/_____
MAURO, J.

_____

* Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.